# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jody Ann Evenson, | Civ. No. 16-969 (MJD/BRT) |
| Plaintiff, | |
| v. | **REPORT AND** |
| | **RECCOMENDATION** |
| Carolyn W. Colvin,<br>Acting Commissioner of<br>Social Security,[1] | |
| Defendant. | |

James Greeman, Esq., Greeman Toomey PLLC, counsel for Plaintiff.

Gregory Brooker, Esq., United States Attorney's Office, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Jody Ann Evenson seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits. This matter is before the Court on the parties' cross-motions for summary judgment, in accordance with D. Minn. LR 7.2(c)(1). (Doc. Nos. 10, 12.) For the reasons stated below, this Court recommends Plaintiff's Motion for Summary Judgment be granted in part and denied in part, Defendant's Motion for Summary Judgment be granted in part and denied in part, and

---

[1]     Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Carolyn W. Colvin as the Defendant in this action.

this matter be remanded for further proceedings consistent with this Report and Recommendation.

## BACKGROUND

### I. Procedural History

Plaintiff applied for Title II disability insurance benefits ("DIB") on September 6, 2012, alleging a disability onset date of June 18, 2012. (Tr. 164.)[2] The Social Security Administration ("SSA") denied Plaintiff's application on April 25, 2013, and again after reconsideration on August 28, 2013. (Tr. 103, 109.) At Plaintiff's request, a hearing was held before an Administrative Law Judge ("ALJ") on July 17, 2014. (Tr. 31, 113–14.) The ALJ denied Plaintiff's application on November 17, 2014, and the Social Security Appeals Council denied her request for review on February 16, 2016. (Tr. 1–3, 6, 25.) The denial of review by the Appeals Council made the ALJ's decision the final decision of the Commissioner. 20 C.F.R. § 404.981.

On April 13, 2016, Plaintiff filed this action seeking judicial review pursuant to 42 U.S.C. § 405(g). (Doc. No. 1.) On June 27, 2016, Defendant filed an Answer along with a certified copy of the administrative record. (Doc. Nos. 7, 8.) The parties have now filed cross-motions for summary judgment pursuant to the Local Rules. (Doc. Nos. 10, 12.) In her motion, Plaintiff alleges three errors were made by the ALJ. First, Plaintiff argues that the ALJ failed to assign appropriate weight to the treating physician's opinion

---

[2]     Throughout this Report and Recommendation, the abbreviation "Tr." is used to reference the Administrative Record (Doc. No. 8).

as required by 20 C.F.R. § 404.1527(c)(2)[3] and Eighth Circuit precedent. (Doc. No. 11, Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") 10.) Second, she argues the ALJ failed to fully consider Dr. Mark Smith's opinion because the ALJ's assessment of Plaintiff's residual functional capacity ("RFC") did not reflect all the limitations provided in Dr. Smith's report. (*Id.* at 13.) Lastly, Plaintiff argues the ALJ's decision is not supported by substantial evidence. (*Id.* at 14.) Defendant disagrees and requests that the Court affirm the Commissioner's decision because the ALJ correctly considered and discussed the reasons for the weight he assigned the various doctor opinions. (Doc. No. 13, Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") 1–2.)

## II.     Factual Background

Plaintiff finished high school in 1991. (Tr. 221.) Since 1997, she has held a variety of jobs, including work as a nanny, cashier, assembler, and most recently, a floral designer and a produce manager at a supermarket. (Tr. 49–50, 53, 171–74.) Plaintiff was thirty-nine years old on June 18, 2012, her alleged disability onset date, was married, and had a young daughter. (Tr. 164.)

Plaintiff estimates that somewhere between six and twelve months before the alleged onset date, she began missing work on a regular basis due to arm and leg pains. (Tr. 47–48.) She went on short term disability in June 2012 for three months, then went on medical leave for a brief period, and was ultimately terminated from her employment

---

[3]     Plaintiff incorrectly cited to subdivision (d) in her brief. The correct citation is 20 C.F.R. § 404.1527(c)(2).

in September 2012. (Tr. 47.) Plaintiff has not worked since then. (Tr. 166.) She currently lives with her husband and eleven-year-old daughter in Lester Prairie, MN. (Tr. 35.)

Plaintiff has a history of psoriatic arthritis (versus fibromyalgia), depressive disorder, and status post right elbow dislocation.[4] At the hearing before the ALJ, Plaintiff testified that her pain was constant, notably in her legs, arms, jaw, and feet. (Tr. 38.) She stated that she can go grocery shopping for a half hour to forty-five minutes, and is accompanied by someone when she does. (Tr. 36.) She does very little cooking at home; she can butter a piece of bread or pour noodles into a pan, but she is unable to lift even an empty pan because it is painful to grasp. (Tr. 37.) She gets dressed about half of the days out of the month; the other half of the days she stays in her robe. (Tr. 43.) She testified that her girlfriends, mother, or husband basically do all of the housework. (Tr. 39.) She stated that she could no longer engage in hobbies that she loved, such as cake decorating, due to pain. (Tr. 40.) She stated that to manage her arthritis symptoms, she uses medication, lays in the sun and pool, and uses a standing tanning bed. (Tr. 38, 52–53.) She noted that she could lift only ten pounds, and could stand for only five to ten minutes because of the pain. (Tr. 41, 42.) She stated that due to her depression, she cries a lot, often isolates herself, and does not answer the phone because she cannot talk without crying. (Tr. 44.)

---

[4] Plaintiff is left-handed. (Tr. 50.)

## III.   The ALJ's Findings and Decision

In his decision dated November 17, 2014, the ALJ found that Plaintiff was not disabled as defined by the Social Security Act and denied Plaintiff's application for DIB. (Tr. 25.) The ALJ proceeded through the five-step evaluation process provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)(4). These steps are as follows: (1) whether the claimant is presently engaged in "substantial gainful activity"; (2) whether the claimant is severely impaired; (3) whether the impairment meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant can perform past relevant work; and, if not, (5) whether the claimant can perform other jobs available in sufficient numbers in the national economy. *Id.* § 404.1520(a)–(f).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 18, 2012, the alleged onset date. (Tr. 13.) At step two, the ALJ found that Plaintiff has the following severe impairments: "psoriatic arthritis v. fibromyalgia, depressive disorder, and status post right elbow dislocation."[5] (Tr. 13–14.) At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § Part 404, Subpart P, Appendix 1. (Tr. 14.) The ALJ considered listings for physical and mental impairments. (Tr. 14–17.)

---

[5]      Also at step two, the ALJ concluded the following impairments were non-severe: plantar fasciitis, migraine headaches, and diabetes. (*Id.*) None of these impairments are at issue on appeal.

Before reaching step four, the ALJ found that Plaintiff had the RFC to perform "light work as defined in 20 CFR 404.1567(b) except the claimant is limited to simple, routine, repetitive tasks and can perform only occasional overhead reaching on the right." (Tr. 17.) The ALJ stated that he made these findings after considering Plaintiff's symptoms, objective medical evidence, and opinion evidence. (*Id.*) With regard to opinion evidence, the ALJ gave the opinion of Dr. Mark Smith, a consultative examiner, significant weight, and gave the opinion of Dr. William Hammes, Plaintiff's treating physician, very little weight. (Tr. 21–22.) The ALJ also considered the assessments made by the State Disability Determination Services psychologists regarding Plaintiff's ability to perform basic mental work activities, and gave their opinion great weight. (Tr. 22.) And the ALJ considered the assessments made by the State Disability Determination Services physicians regarding Plaintiff's ability to perform basic physical work activities, and gave their opinion great weight. (Tr. 22.)

At step four, the ALJ found that Plaintiff is capable of performing past relevant work as a cashier and assembler as "[t]his work does not require the performance of work-related activities precluded by the [Plaintiff's] residual functional capacity." (Tr. 22.) The ALJ stated that "although [Plaintiff's] pain and depression affected her ability to function in a work-like setting, overall, the [Plaintiff's] impairments have not barred her from returning to full-time, gainful employment." (Tr. 18.) The ALJ based his step-four finding on the vocational expert's testimony that an individual with the Plaintiff's RFC would be able to perform the cashier and assembler positions "as they are performed in the general economy and as she performed them." (Tr. 23.)

The ALJ also continued to step five and found, pursuant to the vocational expert's testimony, that Plaintiff could perform additional jobs that exist in significant numbers in the national economy such as school bus monitor and surveillance system monitor in light of Plaintiff's age, education, work experience, and RFC. (Tr. 24.) Thus, the ALJ concluded at steps four and five that Plaintiff was not disabled under the Social Security Act. (Tr. 25.)

## DISCUSSION

### I. Standard of Review

Congress has established the standards by which social security disability insurance benefits may be awarded. The SSA must find a claimant to be disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairments must be "of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Statements about pain or other symptoms "will not alone establish" disability; instead, "there must be medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 404.1529(a). The claimant bears the burden of proving that she is entitled to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a).

Once the claimant has demonstrated that she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the [RFC] to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

The Court has the authority to review the Commissioner's final decision denying disability benefits to Plaintiff. 42 U.S.C. § 405(g); *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). If the Commissioner's decision is supported by substantial evidence in the record as a whole, then the decision will be upheld. 42 U.S.C. § 405(g); *Kluesner*, 607 F.3d at 536 (citations omitted). "[T]he substantiality of the evidence must take into account whatever fairly detracts from its weight, and the notable distinction between 'substantial evidence' and 'substantial evidence on the record as a whole,' must be observed." *Bauer v. Soc. Sec. Admin.*, 734 F. Supp. 2d 773, 799 (D. Minn. 2010) (citations omitted). This test requires "more than a mere search of the record for evidence supporting the Secretary's findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). If, after review, the record as a whole supports the Commissioner's findings, the Commissioner's decision must be upheld, even if the record also supports the opposite conclusion. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The Court may not substitute its own opinion for that of the ALJ's, even if the Court would have reached a conclusion different from that of the factfinder. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

## II. Analysis of the ALJ's Decision

Plaintiff argues that the ALJ erred in (1) failing to assign the appropriate weight to the opinions provided by Plaintiff's treating physician; (2) failing to fully consider consultative examiner Dr. Smith's opinion; and (3) reaching a decision not supported by substantial evidence. (Pl.'s Mem. 10.) The Commissioner argues that the ALJ correctly considered and discussed the reasons for the weight he gave to the various doctor opinions and correctly found Plaintiff's daily activities were only mildly restricted. (Def.'s Mem. 1–2.) Therefore, the Commissioner asserts the ALJ's decision should be affirmed. (*Id.*)

### A. The ALJ Properly Analyzed the Opinion of Dr. William Hammes, Plaintiff's Treating Physician

Dr. William J. Hammes is Plaintiff's primary physician. The record reflects that Plaintiff saw Dr. Hammes twelve times between January 2013 and April 2014 for a variety of concerns. (Tr. 483–87, 489–92, 507–11, 521–25, 536–38, 539–43, 648, 656–60, 677–78, 699–700, 701, 702, 706–07.) Dr. Hammes completed two medical source statements on Plaintiff's ability to do work-related activities – one on June 11, 2013, and the other on June 17, 2014. (Tr. 513–16, 568–70.) On June 11, 2013, Dr. Hammes noted that Plaintiff needed a sit/stand option and she was limited in pushing and/or pulling with her upper extremities. (Tr. 513–14.) He concluded that Plaintiff would be unable to lift eight pounds repetitively; could never climb or crouch; could occasionally balance, kneel, crawl, and stoop; and could occasionally reach, handle, finger, and feel bilaterally. (Tr. 513–15.) He also indicated that Plaintiff should avoid temperature extremes, noise,

dust, humidity, wetness, hazards, and irritants. (Tr. 516.) In his statement approximately a year later on June 17, 2014, Dr. Hammes made almost identical conclusions as in his previous statement, except he concluded that while Plaintiff could only occasionally reach, handle, finger and feel with the left hand, she could never do such activity on the right. (Tr. 568–70.) His environmental limitations also changed so that she was no longer limited by temperature extremes, noise, or irritants, but was still limited by dust, humidity, wetness, and hazards. (Tr. 571.)

The ALJ gave Dr. Hammes's opinions very little weight (Tr. 22), and with respect to Plaintiff's physical RFC, limited Plaintiff to light work with occasional overhead reaching on the right. (Tr. 17.) The ALJ did not incorporate any of the other functional limitations that Dr. Hammes indicated were appropriate for Plaintiff. Plaintiff argues that "the ALJ misapplied the law when weighing Dr. Hammes's opinions and his rationale for rejecting the opinions is insufficient." (Pl.'s Mem. 13.) In particular, Plaintiff contends that Dr. Hammes's opinion should be afforded "controlling weight," or in the alternative, "great weight." (*Id.* at 11.)

A treating physician's opinion on the nature and severity of impairments is entitled to controlling weight, but only when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). If the treating source's medical opinion is not afforded controlling weight, the factors considered in determining the weight to give the opinion are: (1) length of treatment relationship and frequency of examination; (2) nature and extent of the treatment relationship;

(3) supportability of the physician's assessment compared to the record; (4) consistency of the physicians assessment with the record; (5) specialization(s) of the physician; and (6) other factors. *Id.* § 404.1527(c)(2)–(6). "An ALJ may discount a treating source opinion that is unsupported by treatment notes." *Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016) (internal citation omitted). And the ALJ may give a treating physician's opinion less deference when it is based on subjective complaints rather than objective medical evidence. *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (citation omitted). Whether the ALJ gives the opinion of a treating physician great or little weight, the ALJ must give good reasons for doing so. *Id.*

Here, a brief summary of the record with regard to Plaintiff's relevant physical ailments and chronic pain treatment shows there was substantial evidence in the record to support the ALJ giving Dr. Hammes's opinion very little weight.

 Plaintiff's alleged disability onset date is June 18, 2012. In June 2012, Plaintiff saw Dr. Daniel J. Marek for right wrist and elbow pain. (Tr. 325.) She previously had an ulnar nerve transposition done on her right arm and it was noted that she had a history of psoriatic arthritis. (*Id.*) Dr. Marek had x-rays performed on Plaintiff's right elbow and wrist, and the x-rays showed no evidence of fractures, dislocations, or arthritis. (Tr. 324.) Dr. Marek decided to treat Plaintiff's pain with hand therapy, and stated that "[t]here are no added restrictions placed on her from an upper extremity standpoint." (Tr. 324.) Later that month, Plaintiff had an MRI of her right knee based on reports of pain. On all accounts the reading was normal and there was no meniscal tear found. (Tr. 326.) In August 2012, Dr. S. Rizvi at the Arthritis Clinic and Medical Associates, P.C., noted on

examination of Plaintiff that there were no signs of tenderness or swelling with her shoulder, elbow, and wrist joints, and no signs of swelling or tenderness in her hips, knee, or ankles. (Tr. 318.)

In late September 2012, Plaintiff saw Dr. Clement J. Michet, Jr., at the Mayo Clinic for a rheumatology consult. On physical examination, Dr. Michet noted Plaintiff's psoriasis at her elbows and knees, mild swelling of a right thumb joint, and a small effusion at the right knee. (Tr. 475.) He also noted multiple tender points including about the elbows, hips, cervical spine, and plantar fascia. (Tr. 475.) Dr. Michet recommended a trial of sulfasalazine, and if she failed to respond that that, a total body bone scan. (Tr. 475.) On February 26, 2013, Plaintiff reported to Dr. Hammes that she thought the sulfasalazine treatment was helping. (Tr. 483; *see also id.* ("Her fibromyalgia and possible psoriatic arthritis are improved as noted above with the sulfasalazine[.]").) Even so, it appears that a bone scan was done in March 2013. (Tr. 477.) The radiology findings read as follows:

> Vascular phase imaging of the upper limbs is normal. Delayed planar images of the upper extremities show mild articular activity about the elbows and mild symmetric increased uptake in the region of the pisiform/hamate bilaterally. There is also increased uptake about the posterior-inferior aspect of the left calcaneus, which likely reflects enthesopathy. Increased uptake in the right anterior mandible is likely dental related. Patchy calvarial uptake is likely due to benign hypercstosis.

(Tr. 477.) Sometime around this time, Plaintiff started Enbrel injections to treat her psoriatic arthritis. (*See* Tr. 518 (noting the Enbrel injections during an April 8, 2013 visit).)

On April 16, 2013, Plaintiff saw Dr. Hammes again for management of her chronic pain. (Tr. 521.) No examination or medical testing was done specific to her psoriatic arthritis and Dr. Hammes noted that the examination was "mostly limited to the interview." (Tr. 521–25.) Plaintiff reported "quite a bit of psoriatic arthritis related pain in multiple joints in a migratory fashion," and stated that although Vicodin helped initially, "it doesn't seem to be working." (Tr. 521.) Dr. Hammes noted that Plaintiff was recently at Mayo and "they thought that her pain management could be handled by us." (Tr. 521.) He then started Plaintiff on oxycodone on a trial basis. (Tr. 524.) He also noted that Plaintiff had not been able to take her Enbrel regularly for her psoriatic arthritis, "which is the main issue with her pain[.]" (Tr. 525.)

On May 24, 2013, Plaintiff saw Dr. Michet at the Mayo Clinic for a follow-up on her psoriatic arthritis. He noted that at that time Plaintiff had seven Enbrel injections, and although they were uncomfortable, "she has been able to greatly reduce her use of opioid analgesia." (Tr. 552.)

Plaintiff saw Dr. Hammes again on June 11, 2013, however again no examination was done; they only went over some questions on a form sent by Plaintiff's attorney in regard to social security disability. (Tr. 536–38.) Later that month, Plaintiff saw Dr. Hammes for an injury to her foot; no examination was done with regard to her chronic pain. (Tr. 539–43.)

During a follow-up appointment at the Mayo Clinic on July 3, 2013, regarding a possible rash in reaction to her Enbrel injections, the dermatology consultant noted that Plaintiff's "psoriasis is fairly mild at this time." (Tr. 551.) And approximately eight

months later, Plaintiff saw Dr. M. Elizabeth Briden at Advanced Dermatology & Cosmetic Institute, P.A., for her psoriasis. (Tr. 633.) Dr. Briden noted that Plaintiff had previously been placed on Enbrel, "which had greatly improved her psoriasis and arthritis." (Tr. 633.)

Then, in September 2013, Plaintiff fell in her home and dislocated her right elbow. (Tr. 649.) Five days later, Plaintiff had her annual physical with Dr. Hammes. (Tr. 656.) Dr. Hammes noted at that time that Plaintiff's elbow pain "is seeming to be adequately controlled." (Tr. 660.) He also noted that her left arm and lower extremities were normal and testing of her feet was normal as well. (Tr. 660.) On October 14, 2013, two and a half weeks after the dislocation, Plaintiff saw Dr. Marek. (Tr. 619.) Plaintiff reported that she was able to now buckle her pants and shave under her armpits using her elbow. (Tr. 619.) On examination, Dr. Marek noted that Plaintiff was "able to make an okay sign, extend her thumb, abduct and adduct her fingers and make a full fist." (Tr. 619.) On October 21, 2013, Plaintiff saw an occupational therapist, who noted improvement with Plaintiff's elbow. (Tr. 618.)

On October 21, 2013, Plaintiff also saw Dr. Hammes again. In regard to Plaintiff's right arm, Dr. Hammes stated the following:

> Her right arm was checked. She has some difficulty being that is her main side.[6] She was able to remove her brace and move her sweater around such that I could check the arm and there was a little yellowish discoloration typical for this stage of bruising and she had a little swelling

---

[6]     It appears Dr. Hammes was mistaken, as Plaintiff testified that she is left-handed. (Tr. 50.)

of her distal forearm at the wrist that was nontender and I believe it was from just the effects of wearing the splint and possible some low grade migration of blood to that level. It didn't seem to bother her with pressure nor with movement of the wrist.

(Tr. 677.) Two days later, Plaintiff saw Dr. Marek. On examination, Dr. Marek found Plaintiff's motion in the elbow 25 degrees short of full extension, but that she was able to flex to about 100 degrees. (Tr. 616, 683.) He noted "full pronation and supination of the elbow," and stated that "[t]he elbow is maintaining a stable position and there is no evidence of any instability." (Tr. 616, 683.) Dr. Marek recommended nonoperative management and noted they would like Plaintiff to "work[] on more aggressive elbow motion[.]" (Tr. 616, 683.) On October 28, 2013, Plaintiff's occupational therapist noted that Plaintiff stated "she has been using the right arm more during functional activities such as getting her sock started on her foot, washing her hair, lifting the milk and reaching up onto a higher shelf." (Tr. 687.) Two days later at occupational therapy, the therapist noted that Plaintiff "demonstrate[ed] improved [range of motion] for both end range flexion/extension of the elbow." (Tr. 695.)

Plaintiff saw Dr. Hammes again on November 24, 2013, mainly regarding completion of a FMLA form for her husband's place of employment, but also for examination of her elbow and her concern about her range of motion. (Tr. 699.) Dr. Hammes noted that although Dr. Marek thought she should have the elbow manipulated under anesthesia, "right now she actually has quite good function from nearly full flexion to lacking about 20 degrees of extension." (Tr. 699.)

Two months later, Dr. Hammes noted that Plaintiff was having more pain with regard to her psoriatic arthritis, but that she had not been able to use her Enbrel for several weeks because of a sickness. (Tr. 702.) Regarding her right elbow, Dr. Hammes noted that on examination "she had good supination and pronation movements of the forearm and flexion," but she had "reduced extension with about 30–40 degrees of restriction from full extension[.]" (Tr. 702.)

After several months of occupational therapy for her dislocated elbow, Plaintiff still reported stiffness in her right arm. (Tr. 561.) She was examined by Dr. Ann Elizabeth Van Heest in March 2014, who noted that "passive extension can be brought to about 20 degrees shy of full extension." (Tr. 561.) Imaging showed a "concentrically reduced elbow with an ossified mass anteromedially." (Tr. 562.) Dr. Van Heest and Plaintiff determined the plan for treatment would be "for her to initiate an aggressive dynamic elbow extension splinting regimen as guided by a certified hand therapist." (Tr. 562.) There was no mention at that time of any functional limitations from her right elbow, from her psoriatic arthritis, or from anything else.

The last treatment notes from Dr. Hammes in the record are from April 10, 2014, when Plaintiff saw him for a bump on her temple and a cyst on her toe. (Tr. 706–07.) There is nothing noted at that time regarding Plaintiff's right elbow or her chronic pain.

Again, Dr. Hammes gave very broad sweeping functional limitations for Plaintiff two months later in his June 17, 2014 medical source statement. He indicated Plaintiff had limitations in sitting, standing, and pushing and/or pulling with her upper extremities; would be unable to lift eight pounds repetitively; could never climb or crouch; could

16

occasionally balance, kneel, crawl, and stoop; could occasionally reach, handle, finger, and feel with the left hand; could never reach, handle, finger, and feel with the right hand; and had environmental limitations with dust, humidity, wetness, and hazards caused by her impairment. (Tr. 568–71.)

A review of both Dr. Hammes's treatment notes, as well as all of the other medical evidence of record, shows that there simply is not substantial support for Dr. Hammes's proposed limitations. Both Plaintiff's chronic pain and related psoriatic arthritis ebbed and flowed, and were often well controlled by medication. And even when Plaintiff was experiencing pain, there is not substantial medical evidence of record showing that she was functionally limited in the ways that Dr. Hammes indicated. At most of the visits with Dr. Hammes, no medical examination or tests of Plaintiff's psoriatic arthritis or elbow took place; instead, most of the time his treatment notes reflected only Plaintiff's subjective complaints.

The ALJ may give a treating physician's opinion less deference when it is based on subjective complaints rather than objective medical evidence. *Reece*, 834 F.3d at 909. Also, several of Dr. Hammes's treatment notes reflected that Plaintiff's pain was controlled and tests were normal. *See Toland v. Colvin*, 761 F.3d 931, 936 (8th Cir. 2014) (stating that a treating physician's own inconsistency is a sufficient basis to diminish or eliminate the weight of his opinion). And Plaintiff's right elbow, although stiff, was on the mend. There is nothing in the record to support Dr. Hammes's suggested limitations, even if she had yet to regain full extension in her elbow. Therefore, because Dr. Hammes's opinion is not well-supported by medical evidence in the record, and it is

inconsistent with other substantial evidence in the record, the ALJ did not err by declining to give Dr. Hammes's opinion controlling weight or great weight. *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (agreeing with the ALJ for properly discounting the physician's medical source statement which expressed significant limitations that were not reflected in any treatment notes or corroborated by medical evidence).

Further, when determining what weight to give Dr. Hammes's opinion, the ALJ gave good reasons for giving the opinion very little weight, including that "there were no related treatment records from Dr. Hammes which limited the claimant in consistent ways with his claims in this functional assessment," and that Plaintiff's "own testimony contradicted the rather severe limitations Dr. Hammes placed on [Plaintiff]." (Tr. 22.) As to the former, this Court agrees that Dr. Hammes's treatment records did not limit Plaintiff consistent with Dr. Hammes's functional assessment in his medical source statements (nor did other medical records support Dr. Hammes's conclusions). An ALJ may afford less weight to an opinion that is "inconsistent with or contrary to the medical evidence as a whole." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (quotations omitted). And as to the latter, it was not improper for the ALJ to consider Plaintiff's testimony when determining the weight of Dr. Hammes's opinion, particularly when Plaintiff's testimony about her daily activities contradict (at least in some aspects) the conclusions from Dr. Hammes. "[I]f a doctor evaluates a patient as having more physical limitations than the patient actually exhibits in her daily living, an ALJ need not ignore the inconsistency." *Anderson*, 696 F.3d 790, 794 (8th Cir. 2012).

Another reason the ALJ stated for giving Dr. Hammes's opinion very little weight was because it was "unclear what kind of training and education Dr. Hammes received . . . [and] there was no evidence that Dr. Hammes has received any such training to make such claims regarding a patient, therefore, such determinations were out of Dr. Hammes realm of expertise." (Tr. 22.) Plaintiff argues that the ALJ incorrectly questioned Dr. Hammes's training and education (*i.e.*, his credentials). (Pl.'s Mem. 12.) It is unclear to this Court whether the ALJ was attempting to properly consider the "specialization" of the physician as one of the factors to consider under 20 C.F.R. § 404.1527(c)(5) when not affording the treating source's medical opinion controlling weight, or whether the ALJ was questioning Dr. Hammes credentials to give an opinion on Plaintiff's physical limitations.[7] Even if it was the latter, however, such an error would be harmless since the ALJ gave other sufficient good reasons for discounting Dr. Hammes's opinion.

Finally, Plaintiff asserts that the ALJ improperly assigned two different weights to Dr. Hammes's opinion by writing first that the opinion "was not given very much weight," and then concluding his paragraph stating that he gave Dr. Hammes's opinion "very little weight." (Pl.'s Mem. 12 (citing Tr. 22.)) Pointing out the different words used by the ALJ in this instance is a distinction without a difference; he meant the same thing

---

[7]     This Court agrees that Dr. Hammes is considered an acceptable medical source that is able to provide statements about Plaintiff's RFC. *See* 20 C.F.R. §§ 404.1513(a)(1), 404.1502(a) (defining acceptable medical source as a licensed physician).

by both phrases.[8] In any event, Plaintiff's scrutiny of the ALJ's opinion-writing mechanics does not support a conclusion of reversible error. *See Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999) ("We have consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case.").

Therefore, for all of the reasons stated above, this Court concludes the weight assigned to Dr. Hammes's opinion is supported by substantial evidence in the record as a whole, and therefore the ALJ's physical RFC findings should be affirmed.

**B.     The ALJ's Decision is Flawed with Respect to his Consideration of Dr. Smith's Opinion**

The regulations provide that in assessing RFC "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [a plaintiff's] ability to do [work.]" 20 C.F.R. §§ 404.1545(c), 416.945(c). Dr. Mark Smith, a licensed psychologist, completed a consultative examination of Plaintiff on April 9, 2013. (Tr. 499.) Dr. Smith concluded his examination report with the following opinion:

---

[8]     Plaintiff also asserts that the ALJ considered Dr. Hammes's two medical source statements in combination rather than considering the more recent June 8, 2014 statement, which would have been supported by additional treatments. (Pl.'s Mem. 12.) This Court finds no support for this assertion. The ALJ simply referenced that the June 8, 2014 statement "largely affirmed his previous statement, but stated that she could only occasionally reach, handle, finger and feel with the left hand and could do no such activity on the right." (Tr. 22.)

> The claimant's ability to carry out work-like tasks with reasonable pace and persistence is impaired due to her experience of pain and due to her degree of depression. Similarly, her ability to tolerate the stressors and pressures typically found in the entry-level workplace is impaired for the same reasons.

(Tr. 504.)

Plaintiff argues that the ALJ failed to fully consider the opinion of Dr. Smith with regard to Plaintiff's mental RFC because the ALJ purportedly gave Dr. Smith's opinion significant weight, but the ALJ's determined RFC did not reflect all of the limitations in Dr. Smith's report. (Pl.'s Mem. 13.) Specifically, Plaintiff asserts that the ALJ limited Plaintiff's mental capacities to simple, routine, repetitive tasks but did not address what limitations with maintaining pace Plaintiff would have in performing these tasks, or whether Plaintiff must work in a low stress environment, and thus, only considered portions of Dr. Smith's opinion. (*Id.*) Defendant asserts the ALJ did not commit error because he is not required to wholly adopt a medical source's opinion and he properly evaluated the record as a whole. (Def.'s Mem. 12–13.)

In his decision, the ALJ acknowledged Dr. Smith's conclusions and gave his opinion "significant weight"; however, the ALJ did not include any of the limitations provided by Dr. Smith in the Plaintiff's RFC. (Tr. 21; *see also* Tr. 17 ("[T]he claimant has the residual functional capacity to perform light work . . . except the claimant is limited to simple, routine, repetitive tasks and can perform only occasional overhead reaching on the right.").) Dr. Smith's defined limitations did not appear in Plaintiff's RFC despite the ALJ finding that Dr. Smith had an opportunity to examine the Plaintiff, had a history of completing consultative examinations for the SSA, and "the opinion was well-

supported by medically acceptable clinical and laboratory diagnostic techniques and was consistent with the other substantial evidence in the [Plaintiff's] case record." (*Id.*)

The ALJ's decision, as written, is unclear whether he (1) gave Dr. Smith's opinion significant weight as he stated he did, and determined that further specific limitations for pace and persistence and work stressors did not need to be listed in light of his RFC determination, which included restrictions to light work and simple, routine, repetitive tasks, or (2) discounted Dr. Smith's opinion with respect to the limitations for pace and persistence and work stressors, even though he stated he gave the opinion significant weight.

Under the first scenario, the ALJ's decision is flawed in light of *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996). There, the Eighth Circuit Court of Appeals found it was insufficient to accommodate a moderate restriction in concentration, persistence, and pace simply by limiting the person to simple, unskilled work. *Id.*; *see also Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) (stating that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work'"; noting that "the ability to perform simple tasks differs from the ability to stay on task" and that "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace") (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)); *Stewart v. Astrue*, 561 F.3d 679, 684–85 (7th Cir. 2009) (same); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3rd Cir. 2004) (same); *Bourgoyn v. Barnhart*, No. Civ. 01–1377 (JRT/FLN), 2002 WL 31185883, at *4 (D. Minn. Sept. 30, 2002) (remanding because

hypothetical question did not contain limitation based on deficiencies in concentration, persistence, or pace); *Pritchett v. Astrue*, No. C09–2026, 2010 WL 517915, at *13 (N.D. Iowa Feb. 10, 2010) (same).[9] Therefore, if the ALJ gives Dr. Smith's opinion great weight and finds that limitations for pace and persistence and work stressors are warranted, then he must adjust his RFC to reflect those limitations.

The record in this case indicates that the ALJ did not link or incorporate pace and persistence limitations in the simple, routine, repetitive tasks limitation that he provided. Specifically, at the hearing, Plaintiff's counsel asked the vocational expert a separate hypothetical adding in Dr. Smith's limitations on persistence and pace and workplace stressors and pressures, and the vocational expert responded that the person would not be

---

[9]     This Court finds *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) and *Brachtel v. Apfel*, 132 F.3d 417, 421 (8th Cir. 1997), distinguishable.  In both cases, the courts found that the ALJ's hypotheticals including people who were capable of doing simple, repetitive, routine tasks adequately captured the plaintiffs' deficiencies in concentration, persistence, or pace. *See Howard*, 255 F.3d at 582; *Brachtel*, 132 F.3d at 421. However, in *Brachtel*, the hypothetical also included a limitation that the plaintiff "should not work at more than a regular pace." 132 F.3d at 421. The court noted that "[w]hile this is scantly more than what was included in the *Newton* hypothetical, it is enough." *Id.* And in *Howard*, the doctor had described the plaintiff as being "able to sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function." 255 F.3d at 582. Therefore, the evidence linked the two types of limitations together. Here, there is no link. This Court does not know whether Plaintiff would be able to sustain sufficient pace or persistence to be able to perform simple, routine, repetitive tasks. Dr. Smith stated that Plaintiff's "ability to carry out work-like tasks with reasonable pace and persistence is impaired[.]" (Tr. 504.) He did not say what level of impairment Plaintiff was at, nor did he say that with such impairment Plaintiff would have been able to perform simple, routine, repetitive tasks without further limitation. (*See* Tr. 504.)

able to do the jobs he cited under the first hypothetical (*i.e.*, the ALJ's determined RFC), nor would the person be able to do any other jobs:

> Q     Now, let's go back to the Judge's first hypothetical (INAUDIBLE) a light RFC. But as far as non-exertionals, I'm going to add the following limitations based on the consultative examination report at 15F.
>
> Claimant's ability to carry out work-like tasks with reasonable pace and persistence is impaired due to her experience of pain and due to her degree of depression. Similarly, her ability to tolerate the stressors and pressures typically found in the entry level workplace is impaired for the same reasons.
>
> By impaired, if we meant she was unable to maintain reasonable standards of production, would she be able to do the jobs you've cited under the first hypothetical?
>
> A     No.
>
> Q     Any other jobs?
>
> A     No.

(Tr. 58.) Because the ALJ had received this testimony and then ultimately did not include Dr. Smith's additional limitations into the determined RFC, it is indicative that he did not consider pace and persistence limitations encompassed by the simple, routine, repetitive tasks limitation he provided. If he had, then based on the vocational expert's testimony, there would have been no jobs Plaintiff would have been able to perform. Therefore, it appears that the ALJ was trying to achieve conclusion number two in his decision (*i.e.*, discounting Dr. Smith's opinion with respect to the limitations for pace and persistence and work stressors, even though stating in his decision that he gave the opinion significant weight). This Court acknowledges that an ALJ does not need to incorporate

the entirety of a doctor's opinion into the RFC. *See* Social Security Ruling (SSR) 96-5p, 1996 WL 374183, at *4–5 (stating that adjudicators are required to decide whether or not to adopt each individual part of a medical source statement and a RFC determination is an administrative finding reserved to the Commissioner and must be decided by considering all relevant evidence in the record). But here the ALJ gave Dr. Smith's opinion "significant weight" and additionally stated that "Dr. Smith's opinion was well-supported by medically acceptable clinical and laboratory diagnostic techniques and was consistent with the other substantial evidence in the [Plaintiff's] case record." (Tr. 21.) Accordingly, he must explain his reason for failing to include in his RFC determination the limitations that Dr. Smith concluded Plaintiff had with respect to pace and persistence and with respect to workplace stressors and pressures. *See Nimmerrichter v. Colvin*, 4 F. Supp. 3d 958, 969–70 (N.D. Ill. 2013) (stating that an ALJ must explain reason for failing to include in his RFC a limitation given by a medical expert whose opinion he otherwise adopted); *see also Murphy v. Colvin*, 2015 WL 1498942, at *4 (N.D. Ill. Apr. 1, 2015) ("In the absence of any explanation for why he rejected the opinion of the medical expert he found to be reliable and persuasive, the ALJ's RFC determination is not supported by substantial evidence."). Here, the ALJ simply did not do so.

It is unclear whether the ALJ gave significant weight to Dr. Smith's opinion or actually discounted it. Thus, this Court recommends remanding this case to the ALJ. *See Mascio*, 780 F.3d at 637 (concluding that because the court was "left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions," remand was appropriate). If further proceedings are necessary to clarify the

record as to Plaintiff's limitations on persistence and pace and workplace stressors and pressures, if any, the ALJ should open the record to do so. If, however, the ALJ can clarify his opinion based on the record before the Court, he may do so in a revised decision. This Court, however, will not speculate what the ALJ intended when making his RFC determination.

### C.      Question on Substantial Evidence in the Record as a Whole

Plaintiff also asserts that the ALJ's decision is not supported by substantial evidence. (Pl.'s Mem. 14–15.) Because this Court recommends remanding this case for the ALJ to clarify his RFC determination with respect to any limitations on persistence and pace and workplace stressors and pressures, this Court will not make a determination as to whether substantial evidence supports the ALJ's ultimate conclusions on disability. However, this Court notes that Plaintiff's argument in this section of her brief appears focused, at least in part, on the ALJ's findings at step three relating to Plaintiff's activities of daily living. Plaintiff did not appeal the ALJ's findings at step three regarding the Listings, and therefore on remand, this step of the analysis should not be revisited.

### RECCOMENDATION

Based on the foregoing, and all the files, records, and submissions herein, **IT IS HEREBY RECCOMENDED** that:

1.      Plaintiff's motion for summary judgment (Doc. No. 10) be **GRANTED IN PART** and **DENIED IN PART**, and this matter be **REMANDED** under Sentence Four of 42 U.S.C. § 405(g);

2.    Defendant's motion for summary judgment (Doc. No. 12) be **GRANTED IN PART** and **DENIED IN PART**; and

3.    Judgment be entered accordingly.


Date: May 22, 2017                         *s/ Becky R. Thorson*_____
                                           BECKY R. THORSON
                                           United States Magistrate Judge


## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), a party may file and serve specific written objections to this Report and Recommendation by **June 5, 2017**. A party may respond to those objections within **fourteen days** after service thereof. All objections and responses must comply with the word or line limits set forth in D. Minn. LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.